UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MARIA S.

                       **Plaintiff,**

v.                                               5:21-CV-0544 (NAM)

COMMISSIONER OF SOCIAL SECURITY,

                       **Defendant.**
_____

**APPEARANCES:**

Howard D. Olinsky
Olinsky Law Group
250 S. Clinton Street, Suite 210
Syracuse, NY 13202
*Attorney for Plaintiff*

Lisa G. Smoller
Social Security Administration
J.F.K. Federal Building, Room 625
15 New Sudbury Street
Boston, MA 02203
*Attorney for Defendant*

**Hon. Norman A. Mordue, Senior United States District Court Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.    INTRODUCTION**

Plaintiff Maria S. filed this action on May 12, 2021 under 42 U.S.C. § 405(g), challenging the denial of her application for Supplemental Security Income ("SSI") benefits under the Social Security Act. (Dkt. No. 1). After carefully reviewing the Administrative Record, ("R," Dkt. No. 11), the Court reverses the decision of the Commissioner and remands for further proceedings.

1

## II. BACKGROUND

On October 26, 2017, Plaintiff filed an application for SSI benefits, alleging disability beginning on June 11, 2016, due to the following conditions: a hand problem, carpal tunnel syndrome, arthritis, knee problems, diabetes, depression, and anxiety. (R. 197, 368). Plaintiff's claim was initially denied on February 21, 2018. (R. 196).

Plaintiff requested a hearing, which was conducted on November 1, 2019 before Administrative Law Judge ("ALJ") Robyn L. Hoffman. (R. 129–147). A supplemental hearing was held on March 6, 2020. (R. 26–66). The ALJ subsequently issued an unfavorable decision on April 1, 2020. (R. 16–55). The Appeals Council denied review on March 9, 2021. (R. 1–3). Plaintiff then commenced this action. (Dkt. No. 1).

### A. Plaintiff's Background and Testimony

Plaintiff was 51 years old at the time she applied for SSI benefits. (R. 197). She finished eleventh grade in Puerto Rico before coming to the United States in 1989. (R. 137–38). She reported some past work doing childcare. (R. 139). Plaintiff testified that she had pain in her hands, shoulders, back, and hips. (R. 140–42). Plaintiff testified that due to her mental health problems, she mostly stayed home and needs assistance with household chores. (R. 143–45). She testified that she gets depressed and cries most of the time. (R. 146).

### B. Medical Evidence

Because Plaintiff's challenge to the disability determination focuses on her mental health and the ALJ's analysis of related opinions, the Court will not summarize the voluminous medical evidence regarding Plaintiff's physical maladies. Further, the Court will not summarize the opinion evidence in this section as it is discussed in detail below.

On June 7, 2017, Plaintiff was seen by her primary care physician, Dr. Kristen Graves. (R. 837). Dr. Graves noted that Plaintiff had depression and difficulty functioning. (R. 837). Plaintiff presented with anxious/fearful thoughts, depressed mood, diminished interest or pleasure, excessive worry, feelings of guilt, and thoughts of suicide. (R. 837). Plaintiff reported traumatic memories and that her mood was getting worse. (R. 837).

On January 2, 2018, Plaintiff sought mental health treatment with Randall Stetson, Ph.D., LCSW-R. (R. 1360). Dr. Stetson noted that Plaintiff's depression was expressed by excessive worrying expressed as difficulty concentrating, feelings of worthlessness with excessive or inappropriate guilt, loss of interest or pleasure, social withdrawal from friends, sleep difficulty, thoughts of death or suicide, depressed mood occurring numerous times a day, and sad demeanor with irritability. (R. 1360). Plaintiff received cognitive therapy. (R. 1361).

On May 1, 2018, Plaintiff followed up with Dr. Graves for her depression. (R. 1317). Plaintiff reported feeling very down and having difficulty functioning. (R. 1317). She had anxious/fearful thoughts, depressed mood, difficulty concentrating, difficulty falling asleep, difficulty staying asleep, diminished interest or pleasure, excessive worry, fatigue, and feelings of guilt. (R. 1317). She reported difficulty finding a Spanish-speaking therapist and having nowhere else to go for mental health treatment. (R. 1317). She reported hearing a voice telling her to kill herself and sometimes seeing shadows in her room at night that scared her. (R. 1317). Based on her symptoms, Plaintiff's depression was noted to be "severe." (R. 1320).

On July 3, 2018, Plaintiff returned to Dr. Stetson, who noted that she continued to exhibit excessive worrying expressed as difficulty concentrating, feelings of worthlessness with excessive or inappropriate guilt, loss of interest or pleasure, social withdrawal, difficulty sleeping, thoughts of death or suicide, depressed mood, and a sad demeanor. (R. 1363).

On September 11, 2018, Plaintiff saw Dr. Stetson again and reported depression and anxiety. (R. 1881). On examination, Dr. Stetson noted that Plaintiff appeared friendly, attentive, and communicative, but tense. (R. 1881). He noted signs of "mild depression" and that her demeanor was "glum." (R. 1881). Dr. Stetson also noted: intact language skills, appropriate affect, logical thinking, coherent thought processes, and cognitive functioning in the normal range. (R. 1881). Plaintiff's insight and judgment were fair. (R. 1881). There were signs of anxiety, but no signs of hyperactive or attention difficulties. (R. 1881). On visits in October and November 2018, Plaintiff's mental status was mostly the same. (R. 1883).

On December 18, 2018, Plaintiff began therapy with Linda Confer, LCSW-R. (R. 1520). Plaintiff had a depressed mood and tearful affect. (R. 1521). LCSW-R Confer noted that Plaintiff made poor eye contact, was fidgety, and was difficult to engage. (R. 1521). She reported past sexual abuse, poor sleep and appetite, and that she mostly stayed in a darkened bedroom crying and watching television. (R. 1521). She reported hearing voices telling her to jump in front of a moving vehicle. (R. 1521).

On January 7, 2019, Plaintiff saw LCSW-R Confer again and had a depressed mood, anxious affect, and was easily agitated. (R. 1508). Plaintiff exhibited leg shaking and rocking behavior, as well as poor insight and judgment. (R. 1508). She reported thoughts of dying and killing herself. (R. 1509).

On January 30, 2019, Plaintiff saw Dr. Graves again and reported extreme difficulty functioning, with anxious/fearful thoughts, depressed mood, difficulty concentrating, diminished interest or pleasure, excessive worry, fatigue, feelings of guilt, restlessness, and thoughts of death or suicide. (R. 1464). She was noted to be severely depressed with anhedonia, auditory hallucinations, and suicidal ideations. (R. 1468).

On February 6, 2019, Plaintiff saw LCSW-R Confer and was noted to be highly anxious during the session, evidenced by biting her nails and bouncing her leg up and down. (R. 1453). Plaintiff reported not leaving her room and preferring to stay alone. (R. 1453). On February 20, 2019, Plaintiff reported sadness and grief. (R. 1447). Her mood was depressed, anxious, and irritable; her affect was constricted; her speech was pressured and underproductive; her thought process exhibited poverty of content, with preoccupations and ruminations; and her insight was minimal. (R. 1448). Plaintiff had thoughts of dying and killing herself. (R. 1448).

On March 6, 2019, Dr. Graves noted that Plaintiff's mood had not improved. (R. 1810). She had continued suicidal ideation. (R. 1814). On August 7, 2019, Plaintiff reported continued severe depression with depressed mood, difficulty concentrating, diminished interest or pleasure, feelings of guilt, racing thoughts, and thoughts of death or suicide. (R. 1753). Dr. Graves noted that Plaintiff had profound depression with psychotic features that have been treatment resistant. (R. 1765).

On September 27, 2019, Plaintiff returned to see LCSW-R Confer, who noted that she had minimal progress with treatment. (R. 1728). Plaintiff had increased depression and tearfulness and she reported suicidal ideation, poor sleep, poor appetite, and feelings of hopelessness. (R. 1728–29). She was tearful and shook her leg during the session. (R. 1729). On October 11, 2019, Plaintiff reported no improvement in her depression. (R. 1725). Her appearance was disheveled, her posture was fidgety, her eye contact was avoidant, her activity was slowed, her mood was depressed and irritable, her affect was constricted, her speech was pressured and underproductive, and her insight was minimal. (R. 1726).

### C. ALJ's Decision Denying Benefits

At step one of the five-step evaluation process, the ALJ determined that Plaintiff had not engaged in substantial gainful employment since October 26, 2017. (R. 24). At step two, the ALJ determined that Plaintiff had the following "severe" impairments: 1) seronegative rheumatoid arthritis; 2) inflammatory arthritis; 3) fibromyalgia; 4) bilateral shoulder impairment status post rotator cuff repairs; 5) bilateral carpal tunnel syndrome status post-surgical repair; 6) right cubital tunnel syndrome status post release; 7) degenerative joint disease of right knee; 8) major depressive disorder; 9) generalized anxiety disorder; and 10) post-traumatic stress disorder ("PTSD"). (R. 25) (citing 20 C.F.R. § 416.920(c)).

At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526)." (R. 27). At step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform the exertional demands of light work, as defined in 20 C.F.R. § 416.967(b), with the following additional limitations:

> [Plaintiff] can occasionally lift and carry twenty pounds; can frequently lift and carry ten pounds; can sit for up to six hours in an eight-hour day with normal breaks; can stand or walk for six hours in an eight-hour day with normal breaks; can occasionally climb ramps, stairs, ladders, ropes or scaffolds; can perform occasional balancing on uneven terrain, but is not limited in the ability to maintain balance on even terrain; can perform occasional stooping, kneeling, crouching, and crawling; can perform occasional overhead reaching with her bilateral arms, but is not limited in her ability to reach in any other direction; should not perform more than occasional fine manipulation, such as repetitive hand-finger actions, fingering, or feeling with both hands; retains the ability to grasp, hold, turn, raise and lower objects with either hand; should work at simple, routine and repetitive tasks; should work in a "low stress job," defined as occasional decision-making, occasional judgment required, and occasional changes in the work setting; should work at goal-oriented work rather than production pace rate work; should have occasional contact with co-workers and

supervisors; and should have "incidental" contact with the public, with incidental defined as more than never and less than occasional, simply the job should not involve direct interaction with the public but the claimant does not need to be isolated away from the public.

(R. 30).

Next, the ALJ found that Plaintiff had no past relevant work. (R. 45). The ALJ found that Plaintiff was closely approaching advanced age for purposes of 20 C.F.R. § 416.963, that she had a limited education, and that she was able to communicate effectively in English for occupations requiring a language level code of one pursuant to 20 C.F.R. § 416.964. (R. 45). The ALJ then asked a vocational expert whether "jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity." (R. 46). The vocational expert responded that such jobs included car wash attendant and cleaner/housekeeping. (R. 46). Based on this testimony, the ALJ concluded that considering Plaintiff's age, education, work experience, and RFC, she was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 48). Consequently, the ALJ found that Plaintiff was not disabled. (R. 49).

### III. STANDARD OF REVIEW

#### A. Disability Standard

To be considered disabled, a claimant must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the claimant's impairment(s) must be "of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Social Security Administration uses a five-step process to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] [*per se*] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the initial burden of establishing disability at the first four steps; the Commissioner bears the burden at the last. *Selian*, 708 F.3d at 418.

### B. Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citation omitted).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting

inferences can be drawn." *Selian*, 708 F.3d at 417 (citation omitted).  The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is affected by legal error.  42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151.  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112).

### C. Evaluating Medical Opinions

For claims filed after March 27, 2017, as is the case here, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors."  20 C.F.R. §§ 404.1520c(a)–(c), 416.920c(a)–(c).  The ALJ is still required to "articulate how [she] considered the medical opinions" and "how persuasive [she] finds all of the medical opinions."  *Id.* at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1).  The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," and an ALJ is required to "explain how [she] considered the supportability and consistency factors" for a medical opinion.  *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2).

With respect to "supportability," the Regulations state that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  *Id.* at §§ 404.1520c(c)(1), 416.920c(c)(1).  The Regulations state that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with

9

the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(2), 416.920c(c)(2).

## IV. DISCUSSION

Plaintiff challenges the ALJ's decision to deny her SSI benefits on the grounds that "[t]he RFC determination is the product of legal error because the ALJ failed to properly evaluate the opinion evidence of Corey Anne Grassl, Ph.D., Kristen M. Graves, M.D., Randall Stetson, Ph.D., and Linda Confer, LCSW-R." (Dkt. No. 16, p. 3). In response, the Commissioner argues that the ALJ properly evaluated the opinion evidence in determining Plaintiff's RFC. (Dkt. No. 18, p. 3).

### A. Dr. Grassl's Opinion

On January 16, 2018, Corey Anne Grassl, Psy.D., performed a psychiatric consultative examination of Plaintiff. (R. 990–93). Dr. Grassl noted that Plaintiff had difficulty falling and staying asleep, with loss of appetite and weight loss. (R. 990). Plaintiff's symptoms included sad moods, crying spells, guilt, hopelessness, loss of usual interest, irritability, worthlessness, diminished self-esteem, and social withdrawal. (R. 990). She reported exposure to trauma, flashbacks, hypervigilance, avoidance, and intrusive thoughts. (R. 990). On examination, Dr. Grassl noted that Plaintiff's demeanor was cooperative and tearful, and her manner of relating was "fair." (R. 991). Dr. Grassl also noted that: Plaintiff's thought processes were coherent and goal-directed, with no evidence of hallucinations, delusions or paranoia; her affect was depressed; her mood was moderately dysthymic; her attention and concentration were mildly impaired; her recent and remote memory skills were intact; her intellectual functioning was estimated to be average; and her insight and judgment were fair. (R. 991–92).

10

Dr. Grassl diagnosed Plaintiff with Major Depressive Disorder (recurrent episodes, severe) and PTSD.  (R. 993).  Dr. Grassl opined that Plaintiff had no limitations in her ability to understand, remember, and apply simple and complex directions and instructions and use reason and judgment to make work-related decisions.  (R. 992).  But Dr. Grassl opined that Plaintiff was markedly limited in the following areas: ability to interact adequately with supervisors, co-workers, and the public; ability to sustain concentration and perform a task at a consistent pace; ability to sustain an ordinary routine and regular attendance at work; and ability to regulate emotions, control behavior, and maintain well-being.  (R. 992).

The ALJ gave Dr. Grassl's opinion "little persuasiveness."  (R. 42).  The ALJ explained that "the marked limits in various areas of mental functioning and findings that psychiatric problems may significantly interfere with daily functioning are inconsistent with Dr. Grassl's accompanying mental status exam and the overall medical evidence of record from other sources."  (R. 42).

The ALJ stated that in determining Plaintiff's RFC, she had incorporated findings that Plaintiff's stress was specifically triggered by making decisions, exercising judgment, dealing with changes, and other work tasks, which accounted for Dr. Grassl's assessed limitations in regulating emotions, controlling behavior, and maintaining well-being.  (R. 42).  But the ALJ disagreed with Dr. Grassl's restrictions on performing at a consistent pace and maintaining regular attendance, noting that Plaintiff did not have "a history of multiple cancelled medical appointments to indicate difficulty attending to a routine or maintaining a schedule."  (R. 42).  The ALJ also stated that Plaintiff was "not involved in the type of aggressive medical treatment that would require multiple absences from work."  (R. 42).

The ALJ further found that Dr. Grassl's assessment of Plaintiff's significant social limitations was "inconsistent with the accompanying mental status examination and [Plaintiff's] engagement in a range of activities that involve good social interaction." (R. 42). The ALJ added that Dr. Grassl's assessment of Plaintiff's marked limitations in maintaining attention and concentration was "inconsistent with the results of the mental status examinations performed by various medical sources and [Plaintiff's] engagement in a range of activities on a regular basis that involve good attention, concentration, and memory skills." (R. 42).

**1) Consistency**

First, Plaintiff argues that the ALJ did not adequately discuss the consistency of Dr. Grassl's opinion, specifically that the ALJ failed to explain her finding that Dr. Grassl's assessment of marked limitations was inconsistent with the accompanying mental status exam. (Dkt. No. 16, pp. 19–22). However, the ALJ repeatedly cited Dr. Grassl's exam findings in the portion of the decision entitled "Evaluation of All Mental Limitations." (R. 40). For example, the ALJ noted Dr. Grassl's findings that Plaintiff: had normal thought processes; was cooperative and had normal speech and eye contact; was alert and oriented; had normal memory; and had fair insight and judgment and fair social skills (manner of relating). (R. 41). As the Commissioner points out, the ALJ's evaluation of consistency should not be read in isolation but rather in the context of the complete decision. Doing so here, the Court can follow the logic of the ALJ's conclusion that Dr. Grassl's restrictive assessment was inconsistent with her exam findings.

In addition, Plaintiff argues that the ALJ failed to explain her finding that Dr. Grassl's assessment of marked limitations was inconsistent with the results of mental status exams performed by other medical sources. (Dkt. No. 16, pp. 20–21). Once again, the ALJ's

12

evaluation of consistency can be traced back to her earlier analysis of Plaintiff's medical records, which included citations to mental exam findings by LCSW-R Confer and Dr. Stetson. For example, the ALJ noted that "some exams show the [Plaintiff] is attentive with cognition within normal limits" and Plaintiff's insight and judgment were generally fair or better. (R. 41) (citing findings by Dr. Stetson and LCSW-R Confer at R. 1838, 1883). Although the decision could have been clearer, a close reading shows that the ALJ addressed the consistency of Dr. Grassl's opinion with at least some of the mental exam findings made by other medical sources.

### 2) Supportability

Second, Plaintiff argues that the ALJ failed to sufficiently address the supportability of Dr. Grassl's opinion. (Dkt. No. 16, p. 19). Notably, the ALJ did not specifically mention the supportability factor in discussing Dr. Grassl's opinion. (R. 42). Rather, the ALJ's analysis focused on consistency, as discussed above. The Commissioner appears to suggest that the ALJ implicitly discussed supportability in evaluating Dr. Grassl's opinion. (Dkt. No. 18, pp. 9–10). And supportability of mental limitations is discussed in general terms earlier in the ALJ's decision. (R. 40). But the Regulations recognize that consistency and supportability are the crucial factors for assessing medical opinions and require an *explicit* analysis of each—tied to the medical source in question. *See* 20 C.F.R. § 416.920c(b)(2) ("[W]e will explain how we considered the supportability and consistency factors for a medical source's medical opinions.").

Here, the ALJ failed to sufficiently explain how she considered the supportability factor with respect to Dr. Grassl's opinion. Dr. Grassl opined that Plaintiff had marked limitations for her ability to: interact adequately with supervisors, co-workers and the public; sustain concentration and perform a task at a consistent pace; and sustain an ordinary routine and regular attendance at work. (R. 992). The ALJ disagreed with these limitations, but her analysis did not

13

specifically discuss "the objective medical evidence and supporting explanations" presented by Dr. Grassl to support her opinions. 20 C.F.R. § 416.920c(c)(1). The failure to do so was error. *See Robert T.S. v. Comm'r of Soc. Sec.*, No. 21-CV-38, 2022 WL 1746968, at *6, 2022 U.S. Dist. LEXIS 96283, at *20 (N.D.N.Y. May 31, 2022) (observing that the ALJ "is required to discuss the supportability of every medical opinion in the record," and [t]he failure to do so amounts to legal error"); *Brianne S. v. Comm'r of Soc. Sec.*, No. 19-CV-1718, 2021 WL 856909, at *5, 2021 U.S. Dist. LEXIS 43131, at *13 (W.D.N.Y. Mar. 8, 2021) (finding that the ALJ erred by failing to adequately apply the supportability factor because the ALJ "did not examine what [the doctors] used to support their opinions and reach their ultimate conclusions").

To the extent the ALJ made references to supportability elsewhere in the decision, the Court cannot speculate that such analysis would be equally applicable to Dr. Grassl's opinion. For example, the ALJ stated that "marked or extreme limits in various areas of mental functioning," as assessed by other medical sources, were not well-supported "given the scant chronically positive objective clinical findings." (R. 42–43). But this sort of statement hardly substitutes for a specific analysis of the supportability of Dr. Grassl's opinion. Moreover, it is simply not accurate to say that Plaintiff had only "scant chronically positive objective clinical findings" of mental impairment. To the contrary, there are numerous findings that Plaintiff experienced repeated episodes of severe depression, (*see, e.g.*, R. 1447, 1448, 1453, 1486, 1508, 1521, 1728, 1725, 1726, 1729, 1753), which are consistent with the "cycles of improvement and debilitating symptoms" that are a common feature of mental illness. *See Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019). Thus, the ALJ's mischaracterization of the record also undermines the supportability analysis.

### B. Other Opinions

On November 11, 2017, Plaintiff's treating therapist, Dr. Stetson, completed an Examination for Employability Assessment form related to the Onondaga County Department of Social Services/JOBSplus! program. (R. 1191). Dr. Stetson listed Plaintiff's diagnoses as Major Depressive Disorder (Recurrent Episode, Moderate) and Generalized Anxiety Disorder. (R. 1191). Dr. Stetson opined that Plaintiff was moderately limited in the following areas: ability to follow, understand, and remember simple instructions or directions; capacity to perform low stress, simple, and complex tasks independently; capacity to maintain a schedule and attend to a daily routine; capacity to maintain attention and concentration for rote tasks; and ability to function in a work setting. (R. 1191). He opined that she was severely limited in her ability to interact with others and maintain socially appropriately behavior without exhibiting behavior extremes. (R. 1191).

On January 4, 2019, Plaintiff's primary care physician Dr. Graves also completed an Examination for Employability Assessment form. (R. 1203). He listed her mental health diagnosis as Depression with psychotic features. (R. 1203). Dr. Graves opined that Plaintiff was moderately limited in the following areas: ability to follow, understand, and remember simple instructions; ability to perform low stress, simple, and complex tasks independently; ability to interact with others and maintain socially appropriate behavior without exhibiting behavior extremes; ability to maintain a schedule and attend to a daily routine; ability to maintain attention and concentration for rote tasks; and ability to function in the work setting. (R. 1203).

On May 20, 2019, LCSW-R Confer, another therapist, completed an Employability Evaluation form which listed Plaintiff's diagnosis as Major Depression with psychotic features.

(R. 1213).  She opined that Plaintiff was moderately limited in the following areas: ability to perform low stress, simple, and complex tasks independently; ability to maintain attention and concentration for rote tasks; and ability to function in a work setting.  (R. 1213).  She opined that Plaintiff was severely limited in her ability to interact with others and maintain socially appropriate behavior without exhibiting behavior extremes.  (R. 1213).

The ALJ found that these treating providers' opinions were not persuasive because they "amount to a 'check box' form without referral to clinical or diagnostic finding or narrative explanation for the limitations that were provided."  (R. 42).  The ALJ also noted that Plaintiff "was not always found to have any significant mental limits."  (R. 42).  Further, the ALJ found that these assessments were not well-supported "given the scant chronically positive objective clinical findings."  (R. 42–43).

Plaintiff argues that the ALJ failed to properly evaluate these opinions.  (Dkt. No. 16, p. 22).  The Court agrees.  Notably, the forms filled out by Dr. Stetson, Dr. Graves, and LCSW-R Confer were created by the Onondaga County Department of Social Services and did not ask for detailed medical information, such as clinical or diagnostic findings.  Absent such information, a logical supportability analysis of these opinions would have examined the providers' underlying treatment notes, especially since Dr. Stetson, Dr. Graves, and LCSW-R Confer had seen Plaintiff on many occasions and were well-positioned to document her mental health symptoms and related impairments.  *See* 20 C.F.R. § 416.920c(c)(3).  But the ALJ did not address any supporting link between these providers' opinions and their treatment notes.  Further, the Court has already pointed out the faulty premise that only "scant" positive clinical findings supported marked limitations.  Finally, the ALJ did not explicitly address the consistency of these providers' opinions, either with each other or with the record as a whole.

16

### C. Remedy

In general, remand for Social Security claims is appropriate when the ALJ failed to apply the correct legal standards, including adequately considering and applying the regulatory factors of consistency and supportability, unless the failure to do was harmless.  *See Jackson v. Kijakazi*, No. 20-CV-7476, 2022 WL 620046, at *20, 2022 U.S. Dist. LEXIS 37656, at *57 (S.D.N.Y. Mar. 3, 2022).  As discussed above, the ALJ's analysis was partially flawed with respect to the opinions of Dr. Grassl, Dr. Stetson, Dr. Graves, and LCSW-R Confer.  And the Court cannot say that such errors were harmless as the little or no persuasiveness given to these medical opinions almost certainly affected the RFC determination.

Consequently, remand is necessary for the ALJ to reconsider these opinions and the mental health portion of Plaintiff's RFC.  *See Darla W. v. Comm'r of Soc. Sec.*, No. 20-CV-1085, 2021 WL 5903286, at *10, 2021 U.S. Dist. LEXIS 238395, at *25 (N.D.N.Y. Dec. 14, 2021) (remanding due to the ALJ's failure to adequately explain the supportability and consistency factors).

### V. CONCLUSION

For these reasons, it is

**ORDERED** that the decision of the Commissioner is **REVERSED AND REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings consistent with this Memorandum-Decision & Order; and it is further

**ORDERED** that the Clerk amend the caption to substitute KILOLO KIJAKAZI, Acting Commissioner of Social Security, for Defendant Commissioner of Social Security; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

Date: July 29, 2022
Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge